301 So.2d 111 (1974)
Joseph ELIAS, Appellant,
v.
STATE of Florida, Appellee.
Joseph RODRIGUEZ, Sr., Appellant,
v.
STATE of Florida, Appellee.
Nos. 73-118, 73-193, 73-119 and 73-192.
District Court of Appeal of Florida, Second District.
October 2, 1974.
Rehearing Denied October 28, 1974.
*112 I.W. Williams, Minnis, Williams & Milton, St. Petersburg, for appellant Elias.
Arnold D. Levine, Levine, Freedman & Hirsch, Tampa, for appellant Rodriguez.
Robert L. Shevin, Atty. Gen., Tallahassee, and Richard C. Booth and Mary Jo M. Gallay, Asst. Attys. Gen., Tampa, for appellee.
GRIMES, Judge.
Appellants, Joseph Rodriguez, Sr. (sometimes known as Joe Bonimo) and Joseph Elias (sometimes known as Joe Eli), were charged with possession and sale of heroin in October 10, 1972, and again on October 11, 1972. A trial was held for the violations which allegedly occurred on October 10. Viewed in the light most favorable to the State, the evidence may be summarized as follows: Michael Smith was a paid police informer who had volunteered to sell his services to the police. Smith had been talking to Elias about the possibility of Smith selling heroin. He had arranged to meet Elias on October 10, 1972 at the Three Oaks Motel in St. Petersburg where Elias ostensibly worked as a janitor. On that date Smith placed a telephone call from the police department to the motel and asked for Elias. He was told that Elias was not there. He then asked for Joe Rodriguez who owns a substantial interest in the motel. Smith was advised that Rodriguez did not want to be disturbed. Smith then went to the motel after having an electronic monitoring device placed on his person. The police set up surveillance nearby but were only able to hear parts of his conversations. Upon arriving at the motel Smith encountered Mr. Rodriguez. Smith's version of what occurred follows:
Q * * * What did you say and what did Mr. Rodriguez say?
A I asked him if he had seen Jo Eli (Joe Elias).
Q And what did Mr. Rodriguez say?
A He said no he hadn't seen him.
Q Was anything else said?
A Yes, I told him I wanted to cop and he said there wasn't anything he could do about that. He said he would go see if Joe Eli was on 22nd Street.
Smith went on to testify that Rodriguez then got into his automobile and left the motel premises for ten to fifteen minutes. Upon returning Rodriguez announced that he was unable to find Joe Eli. Rodriguez then told a woman who happened to be present to show Smith where Elias' wife stayed. Smith and the woman left the premises to look for Elias but could not locate him. Later that afternoon Smith returned to the motel and saw Elias. Elias told Smith to meet him at a nearby grocery store. Smith went to the grocery store. Elias then directed him to Elias' car and pointed to the trunk where Smith found a bag containing fifty aluminum foil packets of heroin. Smith took the heroin and delivered it to the police.
*113 On cross examination, Smith conceded that in talking to Rodriguez he never used the term "heroin" or any of several other slang expressions which refer thereto. However, he did say that "to cop" was known on the streets to mean "to purchase drugs or heroin." Detective Sams testified that while he was across the street from the motel on October 10 he overheard Smith on the monitoring device tell Rodriquez that he wanted "to cop." Sams testified that in his experience in working on drug-related cases the use of the words "to cop" meant to purchase narcotics.
The following day Smith returned to the Three Oaks Motel with $400 given him by the police. The money was to be used to pay for the drugs that Smith had received the previous day. Arriving at the motel, he talked to Elias who told him to put the money in the top drawer of the dresser in room 14. This room was near the motel office and could be seen by the police from their point of surveillance. Smith testified he deposited the money as instructed and pulled the door closed. The door was constructed in a manner whereby it would automatically lock when closed. A short time later Elias was arrested. The key to room 14 was found on Elias' person. Smith was subjected to a simulated arrest.
Detective Parks was the last to leave the motel after the arrest. He returned about five minutes later to look for his office keys which he thought he had dropped in the parking lot. Upon his return Detective Parks received a radio communication that Elias did not have the $400. Parks went to room 14 and found it locked. He went to the motel office where he saw Rodriguez. Rodriguez allowed Parks to search the office but said he could not give permission to search room 14 because it was occupied. The police waited at the scene guarding room 14 while a search warrant was sought. In the interim the "occupant" of room 14 arrived. This man, James Cooper, stated that he had checked out of room 14 that morning and was only returning to look for an item which he thought he had left in the room. Upon checking out of room 14 he had given his key to Rodriguez. He testified that the key he gave to Rodriguez was the same key that was in evidence, i.e., the same key found on Elias' person at the time of Elias' arrest. Cooper gave the police permission to search the room. The search was made, but no money was found.
In addition, two witnesses testified against Rodriguez under the so-called "Williams Rule." Williams v. State, Fla. 1959, 110 So.2d 654. Bennie Richardson testified that he had been a drug pusher who was now in prison for such activities. He said he had sold heroin for Rodriguez. He would obtain the drugs from Rodriguez in aluminum foil packets, sell them and return the money to Rodriguez, for which services he was paid. He obtained the drugs at the Little Delicatessen and the Three Oaks Motel. He said that Rodriguez' method of operation was never to sell the drugs on the streets himself. J.H. Williams also testified that he had been convicted for the possession and sale of heroin. He said he had been in partnership in the sale of heroin with Rodriguez and a third man named Harris. Rodriguez had obtained the heroin for him to sell. He said that Richardson had worked for Rodriguez and himself prior to Richardson's arrest.
The court directed a verdict of acquittal for Rodriguez on the charge of possession. The jury found Rodriguez guilty of the sale of heroin and Elias guilty of possession and sale. Thereafter, a trial commenced for the violations alleged to have occurred on October 11, 1972. As part of the proof of the transaction on that date, Smith testified that after he had left the $400 in room 14, Elias took him to a nearby alley and pointed out another bag of heroin. Smith picked up the bag, and they returned to the motel where Elias was arrested. Smith turned the heroin over to the authorities. In the middle of this trial, both appellants entered pleas of nolo contendere to the charge of selling heroin. It *114 was stipulated that in addition to the testimony given up until the time the pleas were made the court could also consider the testimony given in the previous case and the testimony of certain witnesses given in a conspiracy case which had resulted in a mistrial. The remaining charges of possession and conspiracy were nolle prossed. All objections, including those directed to the sufficiency of the evidence, were preserved. Both appellants received sentences of five years for the charges upon which the jury had found them guilty. Both defendants were adjudicated guilty on their nolo contendere pleas and received additional five-year sentences to run concurrent with the other sentences.
At the outset Rodriguez complains of the admission of the testimony of Richardson and Williams. We believe this testimony was properly admissible under the rationale of Williams, supra. The evidence was relevant to show the modus operandi of Rodriguez in supplying heroin to agents who would sell it on the streets of St. Petersburg. It was also relevant to demonstrate that because of his connection with narcotics, Rodriguez would necessarily understand what was meant by the words "to cop."
A more significant point is whether the evidence as a whole was legally sufficient to convict Rodriguez of the sale of heroin. Of course, proof that he was an aider and abetter would suffice. Section 776.011, F.S.A.
We perceive the following links between Rodriguez and the heroin transactions: First, Rodriguez knew that Smith was at his motel to purchase drugs from his employee. Second, Rodriguez volunteered to locate his employee for Smith and left the premises for this purpose. Third, having failed to find Elias, Rodriguez directed a woman to help Smith look for him. Fourth, the key to room 14, which was found on Elias' person when he was arrested, was the same key which the occupant of room 14 had given to Rodriquez when he checked out on the morning of April 11. Fifth, Rodriguez was at the motel during the short period of time when room 14 was not being watched by the police and when (if Smith's testimony is believed) the money must have been removed from the room. Sixth, Rodriguez gave as a reason for refusing permission to search the room that it was still occupied when, in fact, the occupant had checked out that morning and left the key with Rodriguez.
At this point, the Williams Rule testimony becomes most pertinent. This evidence reflected that Rodriguez' method of operation was to supply heroin in foil packets to his agents who would sell it on the streets. This was exactly the pattern followed with reference to the sales on April 10 and 11. The jury had a right to conclude that Rodriguez furnished the heroin which Elias sold to Smith. Considering the evidence in its entirety, we believe the jury was entitled to convict Rodriguez as an aider and abetter to these sales. Recognizing that the convictions must be based upon circumstantial evidence, we see no reasonable hypothesis of innocence on the part of Rodriguez. See Davis v. State, Fla. 1956, 90 So.2d 629; Trimble v. State, Fla.App.3d, 1958, 102 So.2d 738.
There is one additional point raised by Rodriguez which deserves comment. The order of final argument was as follows:
1. State opened against Elias.
2. Elias argued.
3. State closed against Elias.
4. Rodriguez argued.
5. State argued against Rodriguez.
6. Rodriguez closed.
Rodriguez contends that since he offered no testimony in his own behalf, he was prejudiced because he was deprived of the opportunity of making the first and last *115 argument to the jury. Smith v. State, 1944, 155 Fla. 148, 19 So.2d 698. He cites Raysor v. State, Fla.App. 4th, 1973, 272 So.2d 867, for the proposition that a proper order of argument would have been:
1. Rodriguez opens.
2. State argues against both defendants.
3. Elias argues.
4. State argues against both defendants.
5. Rodriguez closes.
However, Raysor does not intimate that this is the only proper order of final argument where one of two co-defendants offers no testimony in his own behalf. The order of argument in this case was proper. Insofar as the case against Rodriguez was concerned, Rodriguez did have opening and closing. There is no suggestion that the State improperly argued against Rodriguez during the course of the arguments made in connection with Elias.
Elias also presents several points on appeal. The most significant relate to the question of whether the trial court erred in denying Elias' motions for severance of defendants. The grounds stated in the motions for severance were that (1) the defenses of Elias and Rodriguez were antagonistic, (2) Elias was prejudiced because of certain federal charges pending against Rodriguez as well as news media publicity characterizing Rodriguez as a "reputed heroin kingpin" and (3) the Williams Rule testimony of witnesses Richardson and Williams against Rodriguez would prejudice Elias.
The record does not support the claim that the appellants' defenses were antagonistic. On the publicity question, the voir dire gives no indication that the jury was influenced by any publicity surrounding this case or these appellants. Elias made no showing that such publicity as there may have been prejudiced his client in any way. Sawyer v. State, 1931, 100 Fla. 1603, 132 So. 188.
The case of Suarez v. State, 1928, 95 Fla. 42, 115 So. 519, lends support to Elias' argument that he should have had a severance to avoid any possible effects of the Williams Rule[1] testimony against Rodriguez. There, the Supreme Court held that since the introduction of evidence which was relevant to show a general pattern of criminality against one defendant was inadmissible against two co-defendants, the trial of the two co-defendants should have been severed. The court observed that even if a cautionary instruction had been given, it was doubtful that the prejudicial effect of the testimony as to the co-defendants could be removed from the minds of the jury.
Yet, the underlying rationale of Suarez is not simply that error occurred because competent evidence was offered against one defendant which was inadmissible as to others, but that such evidence was prejudicial to the defendants against whom the evidence was inadmissible. In its opinion, the court noted that the evidence of similar offenses was confusing and that since the jury was not instructed to disregard it as against the other defendants, its introduction was bound to have been prejudicial. Suarez does not hold that whenever evidence which is competent against one defendant but inadmissible against another is offered in a joint trial, there must be a severance.
In the instant case, the court made it abundantly clear to the jury that the testimony of Richardson and Williams was admissible only against Rodriguez and not against Elias. In fact, both these witnesses expressly stated that they had never known of any drug transaction which involved *116 Elias. We do not believe that the admission of the testimony was prejudicial to Elias. Therefore, there was no error in failing to grant his motions for severance. Since the evidence clearly shows that Elias was guilty of the crimes with which he was charged, his convictions must stand.
The judgments are affirmed.
BOARDMAN, Acting C.J., and MANN, J. (Ret.), concur.
NOTES
[1] Suarez pre-dated Williams but the opinion in Suarez recognized the same principles for the admission of evidence tending to show the commission of similar offenses as was announced in Williams.